UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| ASCENSION PROVIDENCE, *et al.*,<br>             Plaintiffs, | )<br>)<br>) |
| v. | ) CAUSE NO.: 2:21-CV-369-JVB-JPK<br>) |
| XAVIER BECERRA, Secretary of the<br>United States Department of Health and<br>Human Services,<br>             Defendant. | )<br>)<br>)<br>)<br>) |

**OPINION AND ORDER**

This matter is before the Court on Defendant's Motion to Dismiss and Motion for Summary Judgment [DE 19] filed by Secretary of Health and Human Services Xavier Becerra on April 8, 2022. This matter is also before the Court on Plaintiff Hospitals'[1] Cross-Motion for Summary Judgment [DE 22] filed on May 27, 2022. The Hospitals responded to the Secretary's motion on May 27, 2022. The Secretary filed a joint reply to his motion and response to the Hospitals' motion on September 9, 2022. The Hospitals replied to their motion on October 28, 2022. For the following reasons, the Court grants the Secretary's motion, denies the Hospital's cross-motion, and grants summary judgment in favor of the Secretary.

**STATUTORY AND REGULATORY FRAMEWORK**

**A. Medicare Part A**

The Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, establishes a nationwide, federally funded health insurance program for eligible beneficiaries. *See*

---

[1] The Plaintiff Hospitals are Ascension Providence, Ascension Providence Hospital-Southfield Campus, Ascension Saint John Hospital, Ascension Saint Vincent Evansville, Ascension Saint Vincent Indianapolis West, Ascension Seton Medical Center Austin, Ascension Via Christi St. Francis, Franciscan Health Crown Point, Franciscan Health Hammond, Franciscan Health Indianapolis, Franciscan Health Lafayette East, Franciscan Health Michigan City, and Franciscan Health Olympia Fields Campus.

42 U.S.C. § 1395c. Medicare reimbursement is governed by a "complex statutory and regulatory regime[.]" *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993).

Part A of the Medicare program provides insurance for covered inpatient hospital and related post-hospital services. 42 C.F.R. § 409.5. Under the Inpatient Prospective Payment System (IPPS), hospitals providing inpatient Medicare services are paid a fixed amount for each patient discharged, regardless of actual costs incurred. *See* 42 U.S.C. § 1395ww(d). To obtain payment, a Medicare provider of service submits its cost report at the end of each fiscal year to a Medicare Administrative Contractor (MAC), which carries out certain auditing and payment functions for the Department of Health and Human Services (HHS). *See* 42 U.S.C. §§ 1395h, 1395x(u), 1395kk-1.

If a provider is dissatisfied with its Part A payments, generally the provider may obtain administrative review by requesting a hearing with the Provider Reimbursement Review Board (PRRB) if certain jurisdictional requirements are met. *See* 42 U.S.C. § 1395oo(a)(1)(A), (f)(1). When a provider raises a challenge that the PRRB determines it lacks authority to decide, the provider may request expedited judicial review (EJR) to proceed in district court with its legal challenge or the PRRB may grant EJR on its motion. 42 C.F.R. § 405.1842(a), (b).

### B. The Disproportionate Share Adjustment

Under the IPPS, payments to hospitals are subject to numerous adjustments. As relevant here, hospitals that serve "a significantly disproportionate number of low-income patients" receive additional payments under 42 U.S.C. § 1395ww(d)(5)(F)(i). A hospital that receives this payment is known as a "disproportionate share hospital" (DSH), and the payment is known as the "DSH adjustment."

Historically, DSH adjustments were calculated retrospectively, based on annual cost reports submitted to the agency containing the actual patient data for that year. Congress altered the DSH program, effective October 1, 2013, making two broad changes to the DSH adjustment: first, hospitals continue to receive the traditional, retrospective DSH payments, but they are paid only 25% of the amount they would have received under the prior approach (the "empirically justified DSH payment"), and second, Congress created a separate DSH payment based on each provider's amount of uncompensated care. 42 U.S.C. § 1395ww(r).

This second payment is calculated using certain estimates that the Secretary makes. 42 U.S.C. § 1395ww(r)(2). Specifically, each provider's uncompensated care payment is the product of three factors. The third factor, which is the subject of the parties' dispute, is the specific DSH's amount of uncompensated care divided by the aggregate amount of uncompensated care provided by all DSHs. 42 U.S.C. § 1395ww(r)(2)(C). Congress enacted a statutory provision precluding judicial and administrative review over "[a]ny estimate of the Secretary for purposes of determining the factors" used in determining this second payment. 42 U.S.C. § 1395ww(r)(3).

### C. HHS's Rulemaking Governing the Uncompensated Care Payment

HHS implemented the uncompensated care payment on a prospective basis—in contrast to the empirically justified DSH payment—so the factors for each fiscal year (FY) (including FY 2021, which is at issue in this case) are calculated as part of the rulemaking process and are not subject to adjustment based on actual patient data. *See, e.g.*, 78 Fed. Reg. at 50,646 (Aug. 19, 2013); 79 Fed. Reg. at 50,019 (Aug. 22, 2014); 85 Fed. Reg. at 58,832-58,833 (Sept. 18, 2020) (final rules for FYs 2014, 2015, and 2021).

In 2020, in connection with FY 2021, HHS decided that, subject to exceptions not germane here, it would estimate each hospital's amount of uncompensated care in FY 2021 based entirely

on the uncompensated care reported by that hospital in Worksheet S-10. *See* 85 Fed. Reg. 58,436 (Sept. 18, 2020) (final rule for FY 2021). HHS chose to use data from FY 2017 cost reports because there had been time to audit that data. *Id.*

In anticipation of Worksheet S-10 becoming a source of uncompensated care data and in response to comments, HHS advised in its 2016 final rules that it was developing standardized instructions to the MACs to guide them in determining when a hospital's Worksheet S-10 should be reviewed. 81 Fed. Reg. 56,964 (Aug. 22, 2016). HHS explained that those instructions might include measures to identify aberrant data for further review and special instructions for review of certain unique categories of hospitals. *Id.* HHS explained that it would "not make the MACs' review protocol public, as commenters have requested," as "[a]ll CMS[2] desk review and audit protocols are confidential and are for CMS and MAC use only." *Id.* In the 2018 final rule, CMS explained that it would "continue to work with stakeholders to address their concerns regarding the accuracy and consistency of data reported on the Worksheet S-10 through provider education and further refinement of the instructions for the Worksheet S-10 as appropriate." 83 Fed. Reg. 41,419 (Aug. 17, 2018).

   *1. Rulemaking for FY 2020*

In a 2019 final rule for FY 2020, HHS reiterated points it had earlier made about the Worksheet and its audit protocol and advised:

> Once the audit protocol instructions were complete, we began auditing the Worksheet S-10 data for selected hospitals in the Fall of 2018 so that the audited uncompensated care data from these hospitals would be available in time for use in the FY 2020 proposed rule. We chose to audit 1 year of data (that is, FY 2015) in order to maximize the available audit resources and not spread those audit resources over multiple years, potentially diluting their effectiveness. We chose to focus the audit on the FY 2015 cost reports primarily because this was the most recent year of data that we had broadly allowed to be resubmitted by hospitals, and many hospitals had already made considerable efforts to amend their FY 2015 reports for

---
[2] "CMS" stands for Centers for Medicare & Medicaid Services.

> the FY 2019 rulemaking. We also considered that we had previously used the FY 2015 data as part of the calculation of the FY 2019 uncompensated care payments; therefore, the data had previously been subject to public comment and scrutiny.
> . . .
> We also noted that the proposed uncompensated care payments to hospitals whose FY 2015 Worksheet S-10 data were audited represented approximately half of the proposed total uncompensated care payments for FY 2020.

84 Fed. Reg. 42,364 (Aug. 16, 2019).

The 2019 final rule for FY 2020 noted that "[m]any commenters expressed support for CMS's proposal to utilize FY 2015 Worksheet S-10 data to determine each hospital's share of overall uncompensated care costs (UCC) in FY 2020," *id.*, and that "many commenters were supportive of CMS's efforts in the continued auditing of Worksheet S-10 data and applauded the efforts to improve the data accuracy and integrity." *Id.* at 42,367. It also described and responded in detail to critical comments CMS received expressing concerns about the idea of the agency using one year of audited FY 2015 Worksheet S-10 data to determine uncompensated care costs for FY 2020. *See id.* at 42,365-79. CMS noted, "it was not feasible to audit all hospitals' FY 2015 report data for the FY 2020 rulemaking," and "[t]he selection of hospitals for the FY 2015 Worksheet S-10 audits was based on a risk-based assessment process, which we believe was effective and appropriate." *Id.* at 42,365.

  *2. Rulemaking for FY 2021*

In June or July of 2019, the MACs started auditing Worksheet S-10 from FY 2017 cost reports. 85 Fed. Reg. 32460, 32754-55 (May 29, 2020). This data was "submitted under the revised cost reporting instructions that were effective on October 1, 2017." *Id.* at 32755. CMS refers to "a detailed discussion of the cost reporting instruction changes between FY 2015 and FY 2017 reports" found at "84 FR 42368 and 42369." 85 Fed. Reg. at 32756 (May 29, 2020). Cost reporting instruction changes are discussed in this section of the Federal Register. Details about the audit

5

protocol that the CMS would be requiring the MACs to undertake to the Hospitals' cost report data, however, are not provided.

In a 2020 final rule, HHS reiterated these points and further advised that it "proposed to use a single year of Worksheet S-10 data from FY 2017 cost reports to calculate Factor 3 in the FY 2021 methodology for all eligible hospitals with [exceptions inapplicable here]." 85 Fed. Reg. 58,818 (Sept. 18, 2020); *see also id.* at 58,436.[3] HHS further "noted that the uncompensated care payments to hospitals whose FY 2017 Worksheet S-10 data had been audited represented approximately 65 percent of the total uncompensated care payments for FY 2021." *Id.* at 58,818.

While many commentators supported using the audited 2017 Worksheet S-10 data extract, others took issue with this approach. *See id.* at 58,821. "[S]everal commentators suggested that CMS ensure transparency in the audit process by making the audit materials and protocols publicly available" and by "develop[ing] a transparent timeframe for the audit process." *Id.* at 58,821. "Many commenters requested that CMS establish a standardized, streamlined process across auditors, which would include . . . consistent timelines for information submissions." *Id.* Some complained that the audits results were, in their view, inconsistent. *Id.* at 58,819, 58,821. Some commenters also protested that there was no way to appeal an audit's findings to the agency. *Id.* at 58,821.

In responding to these comments, the Secretary explained that: (1) as CMS had previously stated, in the FY 2020 final rule and prior rules, "we do not make review protocols public as CMS desk review and audit protocols are confidential and are for CMS and MAC use only," and

---

[3] HHS also noted that "[s]ome commenters argued that audited Worksheet S-10 data are more accurate as compared to the proxy method previously used," that "[s]everal commenters agreed that the data from audited FY 2017 Worksheet S-10s have improved in accuracy when compared to previous years of data, including the data used to calculate Factor 3 under the proxy methodology in previous years," and that "others commended CMS for its efforts to improve the data through revised instructions and audits." *Id.* at 58,819, 58,821.

6

"continue to believe that audit protocols (e.g. crit[]eria) should be confidential"; (2) CMS disagreed with the "impl[cation] that the confidentiality of the audit protocols causes inconsistency in auditing across the MACs," and would "continue to work with the MACs each year to ensure a consistent audit process across providers and MACs"; (3) CMS did "not intend to establish fixed start date for audits across MACs so that we can retain the flexibility to use our limited audit resources to address and prioritize audit needs across all CMS programs each year" but that "MACs work closely with providers regarding scheduling dates during the Worksheet S-10 audit process"; (4) the audit protocols "are provided to the MACs in advance of the audit so as to assure consistency and timeliness in the audit process"; and (5) "[w]e began auditing the FY 2017 Worksheet S-10 data for selected hospitals last year so that the audited uncompensated care data for these hospitals would be available in time for use in the FY 2021 . . . proposed rule." *Id.* at 58,822.

The Secretary also explained that "at this point" he was not adopting some commenters' recommendations to establish an audit and appeals process for the Worksheet S-10, similar to the process used for the wage index audits, "in order to maximize limited audit resources" because "[a]ttempting to replicate the wage index audit process would exceed our current audit resources and require shifting resources from other audit work, for example potentially negatively impacting the wage index audit itself in the attempt to replicate it" and because "[t]he wage index impacts a far greater proportion of national hospital payments than the proportion impacted by Medicare uncompensated care payments." *Id.* at 58,822

The Secretary noted that, although not all of the hospitals were audited due to limited resources, "the proposed uncompensated care payments to hospitals whose FY 2017 Worksheet S-10 data have been audited represented approximately 65 percent of the proposed total

uncompensated care payments for FY 2021, which is an increase from the FY 2015 audits," as in FY 2020 only about half of total uncompensated care payments were expected to be made to hospitals whose Worksheet S-10 data had been audited. *Id.* at 58,822-23. The Secretary concluded that, on balance, the most recent extract of the 2017 Worksheet S-10 reports were the best available data to estimate the uncompensated care fraction to calculate the DSH payments for FY 2021. *Id.* at 58,819.

The FY 2021 final rule was published on September 18, 2020. 85 Fed. Reg. 58432 (Sep. 18, 2020). Through comments, CMS received the request "that CMS disclose the criteria used to identify hospitals subject to audits, and prepare communications regarding expectations for the audit and any audit guidance before the rulemaking cycle." *Id.* at 58821. Additionally, CMS reported: "A commenter noted that CMS's 'policy of opacity' only results in inconsistent interpretations of audit guidance by the MACs." *Id.* Still, CMS declined to publish the audit guidelines, stating the protocols "are confidential and are for CMS and MAC use only." *Id.* at 58822. The FY 2021 final rule impacted the Hospitals during FY 2021, even though the audits were of FY 2017 Worksheets S-10.

## PROCEDURAL BACKGROUND

The Hospitals participate in the Medicare program. (Compl., ¶ 14, ECF No. 1). They state that they "challenge the legality of CMS's adjustments because they were procedural violations of the Medicare Act and violated the APA." *Id.* at ¶ 9. They allege that CMS's audit protocol, as used by MACs, was never submitted through notice-and-comment rulemaking. *Id.* at ¶ 45.

The Hospitals filed PRRB appeals "to challenge the procedurally unlawful policy CMS implemented that used Worksheet S-10 adjustments to and/or disallowances of their Uncompensated Care (UC) Costs derived from audits of Fiscal Year (FY) 2017 S-10 Worksheets

of only a certain percentage of Disproportionate Share (DSH Hospitals to establish the Federal Fiscal Year (FFY) 2021 US Payments in the Medicare Inpatient Prospective Payment System (IPPS) Final Rule." (AR 157, 557). The PRRB concluded that it did not have jurisdiction because 42 U.S.C. § 1395ww(r)(3) precluded administrative review. (AR 7-8, 435-26). Plaintiffs proceeded to file this lawsuit.

## LEGAL STANDARD

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

With an appeal from an administrative agency decision, the district court's review is limited to whether the "final decision of the [agency] … is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Boucher v. United States Dep't of Agric.*, 934 F.3d 530, 547 (7th Cir. 2019). This review—while deferential—must be "searching and careful" and the district court "must review the entire record" and, even in the face of disagreeing with the agency's action, "uphold the action if the agency considered all of the relevant factors" and "a rational basis for the agency's choice" is discernible. *Id.*

When the record shows deficiencies in the agency's determination, the Court may not fill in the gaps on its own. *Id.* To determine whether agency action is arbitrary and capricious, courts "focus primarily on whether the agency considered the relevant data and offered a satisfactory explanation for its action," looking "only for a rational connection between the facts the agency found and the decision it made," and are "not permitted to reweigh the evidence or to substitute

[their] own judgment for that of the administrative agency." *Howard Young Med. Ctr. Inc. v. Shalala*, 207 F.3d 437, 441 (7th Cir. 2000).[4]

## ANALYSIS

Despite the complicated legal landscape in which this case sits, only a single question is presented for the Court's decision: does 42 U.S.C. § 1395(r)(3) preclude administrative and judicial review of the Hospitals' challenge to the audit protocol used for auditing the FY 2017 Worksheet S-10 data that was used in calculating Factor 3 for FY 2021? If yes, then the Secretary's motion for summary judgment must be granted. If no, then the Hospitals' cross-motion prevails.

There is a presumption that agency action is judicially reviewable. *Bower v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 672 (1986). Clear and convincing evidence of legislative intent to restrict access to review is needed to rebut the presumption. *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967). Here, Congress could hardly have been clearer: "There shall be no administrative or judicial review . . . of . . . [a]ny estimate of the Secretary for purposes of determining the factors" used to compute the prospective portion of the DSH payment. 42 U.S.C. § 1395ww(r)(3); *cf. Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447, 452 (7th Cir. 2002) (finding language similar to § 1395ww(r)(3) to be "a clear and explicit indication of Congress's intent to prohibit administrative and judicial review"). The presumption of reviewability is rebutted by this strong expression of congressional intent. In the statute at issue here, administrative review is barred as well as judicial review. Thus, if the Hospitals' challenge is a challenge to such an estimate, then no administrative or judicial review is permitted. Unsurprisingly, the parties dispute whether the Hospitals are indeed challenging the estimate.

---

[4] Initially, the Secretary also moved for dismissal due to lack of jurisdiction. However, the parties now agree that the Court's jurisdiction is limited to review of the PRRB's jurisdictional decision. *See* (Sec'y's Rep. at 21, ECF No. 27); (Hosps.' Rep. at 1, ECF No. 28). As a PRRB determination that it lacks authority to decide a question of law is a final decision that can be appealed, 42 U.S.C. § 1395oo(f)(1), the Court has subject matter jurisdiction.

Notably, the estimates precluded from review are not simply the final numbers used to calculate a hospital's DSH payment. Precluded is "[*a*]*ny estimate* of the Secretary for purposes of *determining the factors*." 42 U.S.C. § 1395ww(r)(3)(A) (emphasis added). Thus, any estimate used for purposes of determining the amount of uncompensated care provided by a hospital is shielded from review. The audited FY 2017 Worksheet S-10 data was used to calculate Factor 3, so, at least on first blush, it appears that this data is an estimate for purposes of determining the factors, which means that a challenge to that audited data is precluded from review. *Accord Ascension Borgess Hosp. v. Becerra*, 557 F. Supp. 3d 122, 132 (D.D.C. 2021) ("The challenged audit procedures are part of the methodology behind the Factor 3 estimate because the data being audited are used to calculate the hospitals' uncompensated care amounts under § 1395ww(r)(2)(C)."). Indeed, two circuit courts that have examined the issue have determined that the data on which an estimate is based is the estimate itself for purposes of determining the applicability of preclusion provisions. *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 18 (2d Cir. 2022); *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 506-07 (D.C. Cir. 2019).

Additionally, if the Court were to grant the Hospitals' requested relief of declaring invalid the audit protocols, *see* (Compl. at 16, ECF No. 1), the logical extension of that relief would be that the Secretary's Factor 3 calculations were invalid. Thus, the review of the audit protocols is functionally a review of the estimate, which is not allowed. *See Yale New Haven Hosp.*, 56 F.4th at 20 ("[W]hat section 1395ww(r)(3) precludes is [the court's] passing on the *validity* of the Secretary's estimate – i.e., [the court's] considering the merits of any argument that such an estimate is *invalid*." (emphasis in original)).

However, the Hospitals make a couple of colorable arguments that the issue is not so handily resolved, which the Court will address. First, the Hospitals contend that they make only a

procedural challenge, which is outside of the scope of the review preclusion provision. In their view, only substantive challenges are precluded by § 1395ww(r)(3). The Hospitals assert that they are only challenging the Worksheet S-10 audit protocol for violation of the notice-and-comment rulemaking requirement.

The Hospitals contend that insufficient rulemaking took place because the review protocols implemented changes in policy regarding what was included under uncompensated care costs. This change in policy, they contend, was required to undergo notice-and-comment rulemaking but was not placed through that process. The end result is that the "Hospitals' DSH payments *as the Secretary estimated* them in the 2021 IPPS Final Rule" were impacted by the purported policy changes. (Pls.' Rep. at 3, ECF No. 28 (emphasis added)).

The Hospitals cite district court cases that recognize a right to bring a notice-and-comment challenge if it does not challenge the Secretary's estimate or underlying data. *Yale New Haven Hosp. v. Azar*, 409 F. Supp. 3d 3, 14 (D. Conn. 2019) *rev'd sub nom. Yale New Haven Hosp. v. Becerra*, 56 F.4th 9 (2d Cir. 2022);[5] *N. Oaks Med. Ctr. v. Azar*, No. 18-9088, 2020 WL 1502185, at *9, --- F. Supp. 3d --- (E.D. La. Mar. 25, 2020). Even if the Court were to accept the reasoning of these opinions, though, the Hospitals are challenging the audit protocols that determined underlying data for Factor 3. To challenge the audit protocols is to challenge the validity of the "underlying data" that the Secretary selected to determine Factor 3, so this falls outside of the scope considered in the Hospitals' cases. *See Ascension Borgess Hosp.*, 557 F. Supp. 3d at 132. Accordingly, this argument fails.

Next, the Hospitals argue that Congress could have specified (and chose not to specify) that procedural claims were precluded in addition to substantive claims. The Hospitals contend

---

[5] The Hospitals' position was not aided by the Second Circuit Court of Appeals' decision overturning the district court *Yale New Haven Hospital* decision. The appellate decision was rendered after briefing in the instant matter had closed.

that in § 1395ww(r)(3) Congress intended to allow procedural claims and disallow only review of substantive claims. To be sure, the statutory language of the preclusion does not delineate between "substantive" and "procedural" challenges to the Secretary's estimates, so a plain reading does not support the Hospitals' argument. *See* 42 U.S.C. § 1395ww(r)(3)(A). The Hospitals counter, though that Congress has elsewhere specifically included procedural challenges in the preclusion, so the lack of such language here is meaningful.

As the Hospitals identify, Congress enacted 42 U.S.C. § 1395nn(i)(3), which mandates that "[t]here shall be no administrative or judicial review . . . of the process under this paragraph (including the establishment of such process)." The language contained in parentheses certainly points out that a challenge to the procedure is precluded. By this Court's reading, though, the parenthetical information is merely explanatory and does not add a supplemental category of precluded challenges. That is, Congress did not preclude review "of the process *and* the establishment of the process"—two separate matters. Instead, Congress precluded review of the process and highlighted that establishment of the process was "include[ed]" as part of the "process" precluded from review. Accordingly, "establishment" challenges (or, what the parties in the instant matter term "procedural" challenges) are merely a subset of the challenges precluded from review by § 1935nn(i)(3)'s statutory language of "the process under this paragraph." The text of § 1395nn(i)(3) does not show that Congress, by not including a parenthetical phrase speaking to the procedural aspects of making estimates, intended to allow procedural challenges to proceed past the review preclusion enacted in § 1395ww(r)(3)(A).

The Hospitals identify several other statutory excerpts where review of the "establishment of" something is precluded. (Pls.' Resp. at 19-20, ECF No. 24 (citing 42 U.S.C. §§ 1395w-3(b)(12)(A), 1395w-4(i)(1), 1395ww(j)(8)). Ultimately, these cited passages do not change the

13

Court's decision that a broader preclusion provision can include preclusion of procedural challenges even where the procedural aspect is not explicitly named.

Again, Congress did not linguistically separate procedural challenges from substantive challenges in § 1395ww(r)(3). The Court finds no just reason to insert a judicially created division between the two when applying this review preclusion provision. The District of Colombia Circuit Court explained it well:

> In this statutory scheme, a challenge to the methodology for estimating uncompensated care is unavoidably a challenge to the estimates themselves. The statute draws no distinction between the two. Instead, it simply provides for payments under a formula consisting of three factors estimated by the Secretary. 42 U.S.C. § 1395ww(r)(2). There is also no way to review the Secretary's method of estimation without reviewing the estimate itself.

*DCH Reg'l Med. Ctr.*, 925 F.3d at 506; *accord Yale New Haven Hosp.*, 56 F.4th at 19.

Further, the Secretary correctly identifies that in *American Society of Cataract and Refractive Surgery*, 279 F.3d at 454, the Seventh Circuit Court of Appeals noted that when a party seeks the invalidation of a policy as relief for a procedural violation, then the challenge is a substantive challenge and not a procedural one. *Id.* (citing *Heckler v. Ringer*, 466 U.S. 602 (1984)).

There are statements in the record indicating how the Hospitals view their challenge in connection to Factor 3 and the DSH payments. First, the Hospitals informed the PRRB that "Providers request a hearing . . . to challenge the procedurally unlawful policy CMS implemented that used Worksheet S-10 adjustments to and/or disallowances of their Uncompensated Care (UC) Costs . . . . These adjustments . . . combine to form a significant cumulative negative effect on the Providers' FFY 2021 UC Payments." (AR 157; 557). The Hospitals argued that "CMS's new policy produced inappropriate data that was used in their calculation of Factor 3." (AR 158; 558). They also stated that "[t]he 2017 S-10 Worksheet audit process impacted payment for providers who were subject to the audits and resulted in reductions in their UCDSH reimbursement," and

"CMS's unpublished S-10 audit policy and protocols have [this] effect: they change the payment providers receive for services they provide to the indigent and uninsured." (AR 16; 434). Before this Court, the Hospitals describe their PRRB appeals as "relating to their UC DSH payments for FFY 2021." (Compl. at 16, ECF No. 1).

The Court has not found an explicit request by the Hospitals that any estimate used to determine Factor 3 be invalidated, though, as mentioned above, the logical extension of declaring the audit protocol invalid is invalidating the estimates calculated from the data resulting from the audit. Careful drafting aside, however, the above statements make clear that the Hospitals' rulemaking challenge to the audit protocols is tied to the impact that those audit protocols have on the DSH payments. The Hospitals are not challenging the audit protocols in the abstract or in a vacuum. They are challenging the audit protocols because of their impact on the Secretary's Factor 3 determinations for the Hospitals. This is a challenge to the Secretary's estimate, and review (both administrative and judicial) is precluded by § 1395ww(r)(3)(A). *Cf. Fla. Health Scis. Ctr., Inc. v. Sec'y of Health and Human Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) (not allowing judicial review where the hospital "is simply trying to undo the Secretary's estimate of the hospital's uncompensated care by recasting its challenge to the Secretary's choice of data as an attack on the general rules leading to her estimate"). Therefore, the Court affirms the PRRB's determination that it lacks jurisdiction to hear the Hospitals' challenges.[6]

## CONCLUSION

Based on the above, the Court hereby **GRANTS** Defendant's Motion to Dismiss and Motion for Summary Judgment [DE 19] and **DENIES** Plaintiff Hospitals' Cross-Motion for Summary Judgment [DE 22]. The Court **GRANTS** summary judgment in favor of Defendant and

---

[6] Based on this outcome, the Secretary's argument for applying issue preclusion is moot.

**AFFIRMS** the PRRB's conclusion that 42 U.S.C. § 1395ww(r)(3) bars administrative review of the Hospitals' challenge.

SO ORDERED on February 16, 2023.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT
